UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

CENTENNIAL INSURANCE COMPANY,

          Plaintiff,

   v.

HORIZON CONTRACTING COMPANY, L.L.C.;
JOHN DOWNEY;
SCOTT BEFFERT;
ROSANNE NARDONE,

          Defendants.

Civil Action No. 05-3917 (KSH)

**OPINION**

**KATHARINE S. HAYDEN, U.S.D.J.**

     This indemnity action arises out of an agreement between plaintiff ("Centennial"), an insurance company acting as surety to defendant general contractor ("Horizon"). Centennial seeks the recovery of losses incurred under various performance and payment bonds issued by Centennial on behalf of Horizon and the individually named defendants for several public construction projects. Centennial has moved for summary judgment, which the Court now grants in part and denies in part.

**I. JURISDICTION**

     The Court has jurisdiction pursuant to 28 U.S.C. § 1332(a) because the plaintiff is a corporation formed under the laws of the State of New York, with its principal place of business in that state; all defendants are citizens of the State of New Jersey (including Horizon, which is incorporated in and has its principal place of business in New Jersey); and the amount in controversy exceeds $75,000. See 28 U.S.C. § 1332(a).

## II. STANDARD OF REVIEW

Summary judgment may be granted under Rule 56(c) of the Federal Rules of Civil Procedure "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The Court is duty-bound to "view the facts in the light most favorable to the non-moving party and [must] draw all inferences in that party's favor." Gray v. York Newspapers, 957 F.2d 1070, 1080 (3d Cir. 1992). Summary judgment is inappropriate if there is evidence sufficient to allow a reasonable jury to return a verdict for the non-moving party, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986), or if the factual dispute is one which might affect the outcome of the suit under the governing law . . . ." Id. The movant's burden, however, "may be discharged by 'showing' . . . that there is an absence of evidence to support the non-moving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Additionally, the non-movant "may not rest upon mere allegations or denials of the . . . pleading"; instead, the non-movant, "by affidavits or as otherwise provided in [Rule 56], must set forth specific facts showing that there is a genuine issue for trial." Matushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

## III. FACTUAL BACKGROUND

### A. Indemnity Agreement

At all times relevant to this dispute, Horizon engaged in the construction contracting business, carrying out both public and private construction projects. See Centennial's Rule 56.1 Statement of Undisputed Material Facts ("Centennial's Statement of Facts") ¶ 2. Because New Jersey law requires contractors carrying out public projects to post performance and payment bonds, see N.J. Stat. Ann. 2A:44-143 et seq., Horizon engaged Centennial to post several bonds

on its behalf relating to three public construction projects for which Centennial had been retained. See Centennial's Statement of Facts ¶ 3; Affidavit of Robert A. Wheeler ("Wheeler Aff.") ¶ 13. The parties executed a surety agreement that included an express indemnity provision, in which Horizon, John Downey, Roseanne Nardone, and Scott Beffert, jointly and severally (collectively, "indemnitors"[1]), agreed to

> indemnify the Surety and hold it harmless from and against all liability, losses, costs, damages, attorneys' fees, disbursements and expenses of every nature which the Surety may sustain or incur by reason of having executed or procured the execution of any such Bonds; and they will pay over and make good to [Centennial] all money which [Centennial] or its representatives shall pay, or cause to be paid or become liable to pay, by reason of its execution of any such Bonds as soon as it shall become liable therefore, whether [Centennial] shall have paid out such sum or any part thereof, or not. The Surety, in its sole discretion, from time to time may advance funds to or for the account of the Contractor for or in connection with the completion of the work under any contract in connection with which it has executed or may execute a Bond or Bonds . . . and for the discharge of obligations incurred in connection therewith or relating thereto, and such advances shall be deemed "losses" under the terms of this instrument whether or not such advances have been so used by the Contractor.

Wheeler Aff. Ex. A, ¶ 6. The indemnitors further agreed that

> if the Surety shall set up a reserve to cover any contingent claim or claims, loss, costs, attorney's' fees and/or other expenses in connection with any such Bond the [indemnitors], within ten (10) days after receipt of written demand, as evidenced by registry or certified mail return receipt, will pay to the Surety current funds in an amount equal to such reserve, and any subsequent increase thereof, such funds to be held by the Surety as collateral, in addition to the indemnity afforded by this instrument, with the right to use the same or any part thereof, at any time, in payment or

---

[1] Horizon has filed for voluntary bankruptcy protection under Chapter 7 of the Bankruptcy Code, case number 07-19524. Thus, all claims against Horizon have been stayed pursuant to the automatic stay provisions of the Bankruptcy Code. See Pl. Br. in Support of Summary Judgment ("Pl. Br.") at 1 n.1. The claims against Horizon and the individual defendants, however, are identical. The thrust of this motion, therefore, relates only to the joint and several liability of those defendants, and not the Horizon entity itself. "Indemnitors," as used in this Opinion, thus refers only to those three individuals.

> compromise of any judgment, claim, liability, loss, damage, attorneys' fees and disbursements or other expenses. . . .

Id. ¶ 7.  Finally, the indemnitors agreed that

> [t]he Surety may settle or compromise any claim, demand, suit or judgment upon any Bond or Bonds executed by it, and any such settlement or compromise shall be binding upon the [indemnitors]. If, however, the [indemnitors] shall timely request the Surety to litigate such claim or demand, or to defend such suit, or to appeal from such judgment, and shall deposit with the Surety at the time of such request cash, or other collateral satisfactory to the Surety in kind and amount, to be used to pay any judgment or judgments rendered or that may be rendered, with interest, costs, expenses and attorneys' fees, including those of the Surety, the Surety shall so litigate, defend or appeal; but nothing herein contained shall be deemed to impose a duty upon the Surety to give notice to the Undersigned of any such claim, demand, suit or judgment.  The vouchers or other evidence of payments made by the Surety shall be prima facie evidence of the fact and amount of the liability of the [indemnitors] to the Surety.

Id. ¶¶ 8-9.

As a result of this agreement ("Indemnity Agreement"), Centennial issued three performance and payment bonds on behalf of Horizon in connection with three separate public construction projects, detailed below.

**B.  Sparta Township Project**

On September 10, 2003, Centennial issued a labor and material payment bond and performance bond, labeled # 447-406616 (the "Sparta Bond"), on behalf of Horizon for the completion of a new municipal building for Sparta Township (the "Sparta Project").  See Wheeler Aff. Ex. B.  Once the Sparta Bonds were posted, Horizon entered into a general contracting agreement with Sparta Township ("Sparta") for construction of the building, see Wheeler Aff. Ex. C, upon which Horizon began performance on October 27, 2003.  See Horizon's Rule 56.1 Statement of Disputed Material Facts ("Horizon's Statement of Facts) ¶ 1.

On June 23, 2005, Sparta terminated Horizon's contract for cause. See Pl. Br. at 5; Wheeler Aff. Ex. D. Sparta thereafter demanded that Centennial complete performance of the project pursuant to its obligations under the Sparta Bond. See Wheeler Aff. Ex. E. Centennial engaged a consulting firm, Meridian Consulting Group ("Meridian") to help the surety conduct an investigation into Sparta's performance claims, as well as outstanding payment claims made by various subcontractors on the Sparta Project. See Wheeler Aff. ¶¶ 16, 20, 21. After the investigation, Centennial and Sparta entered into a Takeover Agreement in which Centennial promised to complete performance of the Sparta Project pursuant to its bonded obligations. See Wheeler Aff. ¶ 17, Ex. F. Centennial claims that, after collecting $664,926.83 in contract balances from Sparta, it incurred net performance losses in the amount of $3,702,991.76. See Pl. Br. at 6; Wheeler Aff. ¶ 19.

In addition to its performance losses, Centennial asserts that it also incurred substantial costs in settling numerous outstanding payment claims by subcontractors on the Sparta Project, which total $703,186.81. See Pl. Br. at 6-7; Wheeler Aff. ¶¶ 20-21, Ex. G. Additionally, Centennial claims that it has incurred $651,073.23 in consulting and attorneys' fees as a result of completing the Sparta project and litigating this matter. See Pl. Br. at 9; Wheeler Aff. ¶ 26. In sum, Centennial claims its losses, costs, and other damages total $5,057,251.80 with respect to the Sparta Project. See Pl. Br. at 9; Wheeler Aff. ¶ 27, Ex. I.

As a result of the performance and payment claims lodged against the Sparta Bond, Centennial established a loss reserve fund pursuant to Paragraph 7 of the Surety Agreement, and subsequently demanded that—pursuant to the same paragraph—the indemnitors post collateral equal to the amount set up in the reserve fund. Centennial alleges that the indemnitors failed to post such collateral, otherwise failed to indemnify Centennial for losses incurred in connection

with completion of the Sparta Project, and that they are therefore in material breach of the Surety Agreement.  See Pl. Br. at 8; Wheeler Aff.  ¶¶ 22-25, Ex. H.

The indemnitors reject Centennial's assertion that the surety is owed anything under the Sparta Bond (in fact, they allege Centennial itself is in breach of the Surety Agreement) because they say Centennial tortiously interfered with their contractual expectancy under the Sparta-Horizon contract, and that Centennial otherwise breached the covenants of good faith and fair dealing implied in the Horizon-Centennial Surety Agreement.  See Def. Br. in Opposition to Summary Judgment ("Def. Br.") at 1-2, 5-9; Affidavit of John Downey ("Downey Aff.") ¶¶ 6-9.

In support of their argument, the indemnitors allege that they were informed by an unnamed employee of its electrical subcontractor, J.M. Electric,[2] that Centennial had secretly met with Sparta officials outside of Horizon's presence to arrange for its termination as general contractor on the Sparta Project.  The indemnitors claim that on May 18, 2005, the unidentified employee informed them that Edward Mislavsky ("Mislavsky"), former Vice-President of Meridian, came out of a conference room with Sparta officials and proceeded to ask him if he would continue to work on the Sparta Project if Horizon was terminated as general contractor.  See Def. Br. at 1-2; Downey Aff. ¶ 6.  This, they argue, constituted "gross tortious interference with Horizon's contractual rights with the Township of Sparta and a gross violation of the duty of good faith and fair dealing owed to Horizon by the Plaintiff . . . ."  See Def. Br. at 2; Downey Aff. ¶ 6.  Centennial, through Mislavsky's affidavit, disputes that such a conspiratorial meeting to terminate Horizon ever occurred.  See Affidavit of Edward Mislavsky ("Mislavsky Aff.") ¶¶

---

[2] In its brief and supporting affidavits, Defendant refers several times to its subcontractor, J.M. Electric, as "he," a designation which the Court repeats herein.  While it is not entirely clear to the Court whether J.M. Electric is in fact a human being, the Court will assume that Defendant means to say that an employee for J.M. Electric witnessed the aftermath of the alleged secret meeting.  See Def. Br. at 1-2; Downey Aff. ¶ 6.

3-6. Other than John Downey and Scott Beffert's affidavits, the indemnitors provide no supporting documentation or evidence of the electrical subcontractor's eyewitness account (including, notably, an affidavit of that person himself).

The indemnitors also assert that Centennial breached its duty of good faith and fair dealing when it failed to investigate and assert various defenses (e.g., change orders and delay damages) to Sparta's termination of Horizon as general contractor, see Def. Br. at 3; Downey Aff. ¶ 8.

Finally, the indemnitors alternatively argue that if they are liable, they are not liable to the extent of the amount claimed by Centennial. See Def. Br. at 3; Downey Aff. ¶ 10-11, Ex F. They claim that the total cost of completion at the time Horizon was terminated was $1.7 million, not approximately $4.4 million. See Def. Br. at 3; Downey Aff. ¶ 10-11. They also argue that when Centennial entered into the Takeover Agreement, Horizon was owed $860,000 in Change Order/Extra Work, a credit of $156,814 (which they neither describe in any further detail nor provides supporting documentation), and a contract balance of $1,283,921.94, which Centennial may never have collected. See Def. Br. at 4; Downey Aff. ¶ 12. The indemnitors also assert that the consulting and attorneys' fees incurred by Centennial are "entirely unreasonable" because these costs would have been avoided if Horizon had been retained as the completion contractor. See Def. Br. at 4; Downey Aff. ¶ 13.

**C. Hackettstown Project**

On October 22, 2002, Centennial issued a labor and material payment and a performance bond, labeled # 447-406610, on Horizon's behalf for the construction of additions and alterations to Hackettstown High School (the "Hackettstown Project"). See Wheeler Aff. ¶ 29, Ex. J. Based on payment claims asserted by at least one subcontractor to the project, Centennial asserts

that it has incurred losses in performance of its bonded obligations, together with costs and attorneys' fees, totaling $131,193.70.  See Pl. Br. at 9; Wheeler Aff. ¶ 31, Ex. K.  In their opposition brief, the individual defendants do not respond to any claims raised by plaintiff regarding the Hackettstown Project.  See Def. Br. at 1-11.

### D.  Warren Project

On December 13, 2002, Centennial issued a labor and material payment bond and performance bond, labeled # 447-406613 (the "Warren Bond"), on behalf of Horizon for the construction of additions and alterations to the Angelo Tomasco School (the "Warren Project"). See Pl. Br. at 10; Wheeler Aff. ¶ 33, Ex. L.  Centennial asserts that it has incurred attorneys' costs in connection with the issuance of the Warren Bond in the amount of $17.50, despite not having paid any claims asserted on the Bond.  See Pl. Br. at 10, Wheeler Aff. ¶ 35, Ex. M. Horizon's only reference to the claim asserted in connection with the Warren Project is a verbatim recitation of the Downey Affidavit that the costs associated with the Warren Project somehow undermine the net losses incurred under the Sparta Bond.  See Def. Br. at 3; Downey Aff. ¶ 10.  It is unclear from the indemnitors' submissions what connection the asserted fees from the Sparta and Warren Projects have to do with each other.  In any event, they claim that they "totally completed" the Warren Project.  See Def. Br. at 3; Downey Aff. ¶ 10.

### E.  Centennial's Total Claimed Losses

Under the three bonds it issued on behalf of Horizon, Centennial asserts that it has incurred losses, costs, and consulting and attorneys' fees totaling $5,188,463.00  See Pl. Br. at 11; Wheeler Aff. ¶ 38.  As discussed above, Centennial argues that under the clear language of the Indemnity Agreement, the indemnitors are jointly and severally liable for the full amount of the losses it claims to have suffered.  The indemnitors claim that they have posited sufficient

factual disputes to overcome summary judgment as to (1) liability and (2) in the alternative, the amount of damages.

## IV. DISCUSSION

### A. Liability

#### 1. Introduction

The Court grants Centennial's motion for summary judgment as to liability under the Indemnity Agreement. The evidence adduced demonstrates that no genuine issue of material fact exists for trial; additionally, under black letter indemnity law and the unambiguous contract at issue here, Centennial is entitled to recoup its losses from the principals whose performance it guaranteed.

Centennial asserts a straightforward argument in support of its motion: (1) Centennial and Horizon entered into a binding surety agreement that contained unambiguous terms; (2) those terms called for Centennial to guarantee performance and payment through issuance of construction bonds, and to perform on those bonds should it be called upon by the obligees to the construction contracts; (3) those terms expressly required the individual defendants to indemnify Centennial for any losses incurred in connection with performing its bonded obligations; (4) Centennial incurred such losses in performance of the bonds; (5) therefore, the indemnitors are obligated to repay Centennial.

The indemnitors contest neither the underlying validity of the Indemnity Agreement nor the clarity in which it is written. Their defense to liability rests almost exclusively on the allegation that Centennial conspired with Sparta officials to terminate Horizon as the general contractor on the Sparta Project. Centennial's complicity in its own losses, the indemnitors argue, amounts to tortious interference with the Horizon-Sparta construction contract, as well as

a breach of the implied covenant of good faith and fair dealing under the Horizon-Centennial agreement.  Defendants believe that Centennial's bad faith is also demonstrated by its failure to pursue several alleged defenses to the termination that they say existed.  For these reasons, the indemnitors argue, Centennial is the party in breach of the Indemnity Agreement, and thus cannot recover its losses here.

      2.  Legal Standards

At the outset, the Court notes several immutable contract principles.  First, under governing New Jersey contract law, a "contract of indemnity is to be interpreted in accordance with the rules governing the construction of contracts generally." Andre Constr. Assocs., Inc. v. Catel Inc., 293 N.J. Super. 452, 456 (Law Div. 1996) (citing George M. Brewster & Son v. Catalytic Const. Co., 17 N.J. 20, 32 (1954); Bowen Eng'g v. Estate of Reeve, 799 F. Supp. 467, 484 (D.N.J. 1992), aff'd, 19 F.3d 642 (3d. Cir. 1994).  Second, while the "fundamental rule in construing contracts calls for the ascertainment of the intention of the parties in the light not only of the language used but also of the surrounding circumstances and the objects sought to be attained by them under their agreement," Cozzi v. Owens Corning Fiber Glass Corp., 63 N.J. Super. 117, 121 (App. Div. 1960), it is equally true that where the terms of a contract are unmistakably clear, the plain meaning of those words will govern without judicial intervention.  See County of Morris v. Fauver, 153 N.J. 80, 103 (1998); Kampf v. Franklin Life Ins. Co., 33 N.J. 36, 43 (1960).  Third, New Jersey contract law binds every party to a contract to an implied covenant of good faith and fair dealing.  See Sons of Thunder v. Borden, Inc., 148 N.J. 396, 420 (1997). Finally, summary resolution of indemnity disputes with unambiguous contractual provisions is appropriate.  See U.S. Fidelity & Guaranty Co. v. Feibus, 15 F. Supp. 2d 579, 581 (E.D. Pa. 1998), aff'd, 185 F.3d 864 (3d Cir. 1999).

In New Jersey, to recover on a claim for tortious interference of contract, a party must prove (1) a plaintiff's existing or reasonable expectation of economic advantage or benefit; (2) a defendant's knowledge of the plaintiff's expectancy; (3) wrongful and intentional interference with that expectancy by the defendant; (4) a reasonable probability that the plaintiff would have received the anticipated economic advantage absent such interference; and (5) damages resulting from the defendant's interference.  Printing Mart v. Sharp Elec. Corp., 116 N.J. 739, 751-53 (1989).

### 3. Analysis

In support of their tortious interference/bad faith[3] theory, the indemnitors claim that an unnamed employee of its electrical subcontractor witnessed Edward Mislavsky, former Vice-President of Meridian, leave a secret meeting with Sparta officials in which the two camps had arranged for Sparta to terminate Horizon as general contractor.  Furthermore, the indemnitors say that the employee told Horizon officials that Mislavsky asked him (the employee) whether he would consider staying on as subcontractor if Horizon were to be terminated.  See Downey Aff. ¶ 6; Beffert Aff. ¶11.  These allegations constitute the basis upon which the individual defendants' tortious interference argument rests.  Aside from being emphatically controverted by Mislavsky himself, see Mislavsky Aff. ¶¶ 4-6, the statements of J.M. Electric are hearsay and cannot be considered on a motion for summary judgment.

---

[3] Defendants claim that Centennial tortiously interfered in the Horizon-Sparta contract, and as a result breached its duty of good faith and fair dealing under the Horizon-Centennial contract.  If the facts as the indemnitors allege them are true, then the existence of tortious interference would necessarily give rise to a breach of good faith.  Thus, the Court treats the two claims together as they relate to defendants' conspiracy theory.  Their additional claim that Centennial engaged in bad faith dealing because it did not assert Horizon's defenses to termination will then be discussed infra.

It is well-settled that hearsay that would be inadmissible at trial may not be considered at the summary judgment stage. See, e.g., Blackburn v. UPS, Inc., 179 F.3d 81, 96 (3d Cir. 1999) (citing Philbin v. Trans Union Corp., 101 F.3d 957, 961 n.1 (3d Cir. 1996) (noting that a hearsay statement that is not capable of being admissible at trial should not be considered on a summary judgment motion)); Williams v. West Chester, 891 F.2d 458, 466 n. 12 (3d Cir.1989); Proctor v. Armds, No. 04-899, 2006 WL 3392932, at *4 (D.N.J. Nov. 21, 2006).

Rule 801(d)(2) of the Federal Rules of Evidence provides the only plausible basis for admission of Mislavsky's statements. That rule excludes admissions of a party-opponent (and certain authorized representatives) from the definition of hearsay. See Fed. R. Evid. 801(d)(2). Even if Mislavsky could be characterized as a person falling within the rule (and it is unclear whether he could be in the first place), his alleged statements are inadmissible here. While "[a]dmissions by a party-opponent need not be based on personal knowledge to be admitted under Rule 801(d)(2)," see United States v. Ammar, 714 F.2d 238, 254 (3d Cir. 1983), Mislavsky's statements have been relayed through the out-of-court assertion of the unidentified electrical subcontractor. Thus, the relevant hearsay focus is on the subcontractor's statement to Horizon officials, not Mislavsky's statement to the subcontractor. The subcontractor's statement is an out-of-court statement used to prove the truth of the matter asserted (i.e., that Mislavsky indicated to him that Centennial had arranged for Horizon's termination), and thus the Court finds it to be double hearsay and not falling within any other hearsay exception. Thus, the statement is inadmissible and will not be considered for this motion. See Carden v. Westinghouse Elec. Corp., 850 F.2d 996, 1002 (3d Cir. 1988) (excluding double hearsay statements); see also Fed. R. Evid. 805 ("Hearsay within hearsay is not excluded under the

hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided in these rules.").

The Court is left with the unsubstantiated accusation that Centennial conspired with Sparta to terminate Horizon. Nevertheless, the indemnitors argue that "for purposes of this motion, the fact of the complicity of [Centennial] in the termination must be assumed to be true . . . ." Def. Br. at 7. The indemnitors are incorrect:

> At the summary judgment stage, facts must be viewed in the light most favorable to the non-moving party only if there is a "genuine" dispute as to those facts. . . . As we have emphasized, when the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial. The mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

Scott v. Harris, 127 S. Ct. 1769, 1775-76 (2007) (emphases in original); see also Elwell v. PP&L, Inc., 47 Fed. App'x 183, 187 (3d Cir. 2002) ("On a motion for summary judgment, the court must accept as true all reasonable inferences that favor the non-moving party. However, we may only consider reasonable inferences; we may not improperly consider those inferences that are unreasonable.") (internal citations omitted). Without admissible evidence to support its conspiracy theory, the Court finds the inference that Centennial prompted Sparta to terminate its contract with Horizon to be unreasonable. Therefore defendants, at the very least, cannot prove the third (and fundamental) element of a tortious interference claim—intentional or malicious interference with a prospective or existing contractual relationship. See Pitak v. Bell Atl. Network Servs., 928 F. Supp. 1354, 1369 (3d Cir. 1996).

The Court finds it telling that the indemnitors were unable to identify or procure the affidavit of the individual who witnessed the alleged secret meeting, or even to name a date that the secret meeting took place. And Centennial emphatically denies through the affidavit of Mislavsky (the very person accused of divulging the conspiratorial information) that a secret meeting ever existed. The indemnitors submit no admissible evidence of anyone with first-hand knowledge of the encounter. They have not met its burden, "by affidavits or as otherwise provided in [Rule 56]," of setting forth specific facts showing that there is a genuine issue for trial. Matushita, 475 U.S. at 586. Because no rational factfinder could believe Centennial's conspiracy theory on the admissible evidence presently before the Court, defendants have failed to show the existence of a genuine issue of material fact with respect to their tortious interference defense to liability.

Nor does there exists a triable dispute over whether Centennial breached its duty of good faith by failing to pursue certain defenses to termination that defendants say existed. First, "[b]ad faith is not simply bad judgment or negligence, but rather it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity." Feibus, 15 F. Supp. 2d at 585. The absence of "diligence or [existence of] negligence is not the equivalent of bad faith . . . ." Id. Second, the indemnitors point to no legal authority or evidence that Centennial owed an immediate and automatic duty under the Indemnity Agreement to assert Horizon's defenses against *termination*. Centennial argues—and the Court agrees—that Paragraph 11 of the Takeover Agreement expressly preserves Horizon's rights and remedies against Sparta. See Pl. Reply Br. at 13-14, Wheeler Aff. Ex. F ¶ 11. Defendants have not asserted these rights against Sparta. The Court is befuddled as to how they can fail to assert their own expressly preserved legal rights against the counterparty that allegedly breached the construction contract, yet

simultaneously claim that their third-party surety should have done it for them. To be sure, Centennial covenanted under the Indemnity Agreement to come to defendants' aid with respect to any claim *under the bonds*, see Wheeler Aff. Ex. A, ¶¶ 8-9, but made no such promise to defend against a primary breach of the construction contract itself.

Even if the Indemnity Agreement could be interpreted to obligate Centennial to defend against a wrongful termination, before such a duty arose the Agreement required the indemnitors to provide Centennial with a request to defend, plus sufficient collateral to mount the defense. See id. They provided neither. Thus, under the Indemnity Agreement, Centennial was not obligated to assert the indemnitors' alleged defenses to termination of the Sparta-Horizon contract, and as a result did not breach its duty of good faith and fair dealing under its own contract with Horizon.

Cementing the indemnitors' liability under the Indemnity Agreement is the *prima facie* evidence clause in Paragraph 9. See Wheeler Aff. Ex. A ¶ 9, which states in pertinent part: "The vouchers of other evidence of payments made by the Surety shall be prima facie evidence of the fact and amount of the liability of the [indemnitors] to the Surety." Id. Defendants argue that they are "liable to the indemnitee only after it has been definitely ascertained that loss or damages has been sustained and judgment has been entered against it, and until that has occurred no responsibility exists." See Def. Br. at 5 (citing Bd. of Educ. v. Utica Mut. Ins. Co., 172 N.J. 300, 307 (2002). However, this is a default common law rule which may be superseded by private contract. See Feibus, 15 F. Supp. 2d at 583 ("[R]esort to implied indemnity principles is improper when an express indemnification contract exists; when there is such an express contract, a surety is entitled to stand upon the letter of the contract."). Courts have long upheld *prima facie* evidence clauses and shifted the burden to the non-movant to show that a rational

15

factfinder could determine that liability has not attached. See id.; Gundle Lining Constr. Corp. v. Adams County Asphalt, 85 F.3d 201, 210 (5th Cir. 1996) (payment vouchers evidencing fact and amount of liability shifts burden under Rule 56 to principals); Continental Cas. Co. v. American Sec. Corp., 443 F.2d 649, 650-51 (D.C. Cir. 1970) (photostats of canceled checks and sworn affidavits alone were sufficient to support the summary judgment granted by the district court); Curtis T. Bedwell & Sons, Inc. v. Int'l Fidelity Ins., No. 83-5733, 1989 WL 55388 at *3 (E.D. Pa. May 23, 1989) (submission of affidavits and supporting documentation of the expenditures made under the bonds was sufficient to shift the burden under Rule 56 to the non-moving party). Here, as in Feibus and the cases cited above, Paragraph 9 unambiguously creates a presumption of liability upon evidence of payment. With respect to the liability question, the indemnitors have not met their burden of materially rebutting the Wheeler Affidavit, which contains extensive evidence of payments and claims regarding its performance on the bonds.[4]

    4. Conclusion

Centennial's motion for summary judgment is granted with respect to liability under the Indemnity Agreement as it relates to the Sparta Bond. Further, the Court agrees with Centennial that because the indemnitors do not contest liability under the Hackettstown Bond, along with the evidence submitted in support of its motion, summary judgment is appropriate. Thus, the Court also grants Centennial's motion as it pertains to liability under the Hackettstown Bond. Finally, the Court is convinced that the attorneys' fees Centennial incurred with respect to coverage opinions concerning the Warren Bond also subject Horizon to liability despite the fact that Horizon completed the project, and thus grants summary judgment accordingly. See Wheeler Aff. Ex. K.

---

[4] The Court discusses the prima facie evidence clause in Paragraph 9 as it relates to damages in Section IV.B, infra.

### B. Damages

Centennial's motion for summary judgment is denied with respect to damages. Centennial submits evidence in support of its motion in the form of disbursement checks as a result of performing its bonded obligations and claims spreadsheets detailing the various claims made under the bonds. See Wheeler Aff. Exs. G, I, K, M. The indemnitors dispute the true extent and the reasonableness of the damages incurred by Centennial. In opposition to the motion, they submit a spreadsheet prepared by Edward Mislavsky totaling $1.7 million, far less than the approximately $5 million Centennial claims. See Downey Aff. Ex. F. Furthermore, the indemnitors claim that Horzon was owed a contract balance of roughly $1.28 million, as well as $860,000 in Change Order/Extra Work. See Def. Br. at 3, Downey Aff. ¶ 12.

The Court agrees that there remains a genuine dispute as to exactly what damages Centennial is entitled. It is readily apparent that Centennial has made substantial payments in performing its duties under the bonds. The Court notes that the indemnitors have not disputed the existence of at least $1.7 million in bona fide disbursements by Centennial. Centennial argues that by virtue of the *prima facie* evidence clause in Paragraph 9 of the Indemnity Agreement, discussed supra, it is automatically entitled to the amount it claims. While courts routinely recognize *prima facie* evidence clauses in indemnity contracts, see, e.g., Feibus, 15 F. Supp. 2d at 583, they only provide *rebuttable prima facie* evidence of what an indemnitee should receive. See Andre Const., 293 N.J. Super. 452 at 456-57 ("At the heart of the surety-principal relationship is the intention of the parties—clearly established in the indemnity agreement—that the surety will be repaid for all claims paid or expenses incurred as a result of issuing bonds on behalf of the principal."). Where, however, a court cannot determine as a matter of law precisely

what amounts were actually paid by the surety, a *prima facie* evidence clause, as a purely factual matter, cannot not withstand summary judgment scrutiny. That is the case before the Court. Centennial says the total losses it incurred and paid in connection with the Sparta project (including performance and payment losses minus contract balances received from Sparta) is roughly $4.4 million. See Pl. Br. at 6-7. In response, defendants submit a spreadsheet reportedly generated by Mislavsky indicating the total cost of completion to be around $1.7 million. See Def. Br. at 3; Downey Aff. Ex. F. This spreadsheet, if credited by a trier of fact, would tend to show that Centennial in reality disbursed less than the total $5 million in indemnity it claims. Moreover, Centennial has not submitted all checks which it has reported to have disbursed, which would further support a theory that Centennial's losses were not as much as it claims. See Wheeler Aff. Ex. G. While the *prima facie* evidence clause in Paragraph 9 permits "other evidence" to support entitlement to a particular amount of damages, the Court is unconvinced that the other evidence (the claim detail spreadsheets) submitted here undercuts the Mislavsky spreadsheet so much that the damages issue should be determined summarily.

## V.  CONCLUSION

For the foregoing reasons, Centennial's motion for summary judgment is granted in part and denied in part. The Court grants the motion with respect to liability under the Sparta, Hackettstown, and Warren Bonds, and denies the motion pertaining to damages. An appropriate Order accompanying this Opinion will be entered.

/s/  Katharine S. Hayden

KATHARINE S. HAYDEN
UNITED STATES DISTRICT JUDGE